J-S19021-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.P. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1065 MDA 2023 |

Appeal from the Order Entered June 29, 2023
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
2022 10774

BEFORE:   DUBOW, J., BECK, J., and COLINS, J.[*]

MEMORANDUM BY BECK, J.:                          **FILED AUGUST 15, 2024**

C.P. appeals from the order entered by the Luzerne County Court of
Common Pleas ("trial court") denying her petition to restore her firearm rights
pursuant to 18 Pa.C.S. § 6105(f)(1).[1]  On appeal, C.P. challenges the trial
court's exercise of its discretion, alleging that its judgment relied upon a

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  Section 6105 states the following:

> Upon application to the court of common pleas under this
> subsection by an applicant [who has been, inter alia, involuntary
> committed under section 302 of the Mental Health Procedures Act
> ("MHPA"), 50 P.S. §§ 7101-7503, Act of Jul. 9, 1976, P.L. 817, as
> amended,] the court may grant such relief as it deems appropriate
> if the court determines that the applicant may possess a firearm
> without risk to the applicant or any other person.

18 Pa.C.S. § 6105(f)(1).

multitude of factual findings that were not supported by the record. After careful review, we affirm.

In April 2008, C.P.'s sister, concerned for C.P.'s well-being because of her use of marijuana and Vicodin, called the police for a welfare check. C.P.'s sister completed an application for involuntary emergency examination and treatment pursuant to section 302 of the MHPA ("302 petition"), averring that C.P. was severely mentally disabled and in need of treatment:

> My sister told me today within the last hour that she did not want to be here on earth alive. On Monday, she confessed to me that she attempted suicide by taking a bottle of Xanax to kill herself and crashed her car. The paramedics found her unconscious in her car. She has told me that she has been under treatment for depression and anxiety and may have stopped treatment due to loss of job.

302 Petition, 4/24/2008. The application also noted that C.P. was a clear and present danger to herself and others because she had attempted suicide, and there was reasonable probability of suicide unless adequate treatment is afforded under the MHPA. *Id.*

As a result, the police found C.P. and asked her to accompany them to a hospital in Hazelton, Pennsylvania for an evaluation. She voluntarily complied. A psychologist evaluated C.P. and recommended inpatient treatment. C.P. initially refused inpatient treatment out of concern for her firearm rights but eventually agreed to it. She was transferred to Geisinger Bloomsburg Hospital ("Bloomsburg"), where she accepted treatment. She remained hospitalized for three days and two nights. The hospitalization was

deemed to have been a section 302 commitment; consequently, C.P. was restricted from owning a firearm.[2]

After she was discharged from the hospital, she received treatment from Dr. Joel Cahn for eight years before seeking an abuse and addiction specialist, Dr. John P. Seasock, Psy.D., LPC, for weekly treatment, among other programs. In 2016, Dr. Seasock determined C.P. to have a substance use disorder. Since then, however, C.P. has been confirmed sober through tests and voluntary completion of consistent treatment. Furthermore, Dr. Seasock determined that her substance abuse is in remission. In October 2022, Dr. John A. Reinhardt, Ph.D., administered an MMPI-2[3] to C.P. Dr. Reinhardt noted that the test did not provide any results suggestive of a personality disorder or mental health issues, and did not reflect suicidal ideation, self-harm, or harm to others.

---

[2] We note that trial court found that C.P.'s 2008 hospitalization at Bloomsburg was the basis of her 302 commitment. Trial Court Opinion, 11/20/2023, at 3. However, in his 2022 report, Dr. Seasock indicated that C.P. "signed herself in on a 201 procedure to attain treatment" at Bloomsburg, noting that she "is currently seeking to amend her inaccurate treatment history." Report, 10/18/2022, at 1 (unnumbered); **see also** 50 P.S. § 7201 (stating, in relevant part, "Any person 14 years of age or over who believes that he is in need of treatment and substantially understands the nature of voluntary treatment may submit himself to examination and treatment under this act, provided that the decision to do so is made voluntarily."). Nevertheless, C.P. does not challenge the propriety of the involuntary commitment finding in this appeal. Therefore, we will address the claim raised in this appeal on the premise that C.P. was involuntarily committed in 2008.

[3] Minnesota Multiphasic Personality Inventory, 2nd Edition. This test helps practitioners identify abnormal cognitions and mental health disorders.

On November 29, 2022, C.P. filed a petition for restoration of her firearm rights. On February 8, 2023, the trial court held a hearing on C.P.'s petition at which C.P. and Dr. Seasock testified. C.P. testified that she was using Vicodin and marijuana at the time of her commitment, and further testified to her treatment until the date she filed the petition. N.T., 2/8/2023, at 25-27, 31. She further testified that she signed a form to voluntarily commit herself at Bloomsburg because she did not want to lose her firearms rights. *Id.* at 26. In response to the question of whether she attempted suicide, C.P. stated, "I don't know if I would – I could say like, yeah, I wanted to die[,] but definitely the drug use contributed to a very bad mental state." *Id.* at 33; *see also id.* (admitting that her sister filed the 302 petition because she "was using a lot of drugs at the time and I actually crashed my car"). C.P. additionally testified to an arrest in November 2016 involving the possession of drugs. *Id.* at 29.[4] C.P. noted that police, performing a wellness check on people living with her, searched the entire residence and found marijuana and cocaine in her bedroom. *Id.* at 30. C.P. stated that the charges were dismissed and expunged after she successfully completed treatment court. *Id.* C.P. further noted that she was diagnosed with depression and anxiety while in college for which she has sought therapy and takes prescribed anti-depression and anti-

---

[4] This arrest was not made part of the record until C.P. testified to it at the hearing.

- 4 -

anxiety medication. *Id.* at 34. C.P. indicated she also takes a nerve medication for a current injury. *Id.*

C.P. testified that she discovered that she had an involuntary commitment on her record a few years after 2008, when she "went to the store to purchase a shotgun for turkey hunting and [] was denied." *Id.* at 28. C.P. stated that she wants her firearms restored because she grew up hunting with her father, spent a lot of time alone in the woods, requesting her rights be restored "for safety reasons as a result of hunting." *Id.* at 32.

Dr. Seasock testified as an expert in the field of psychology. *Id.* at 12. Dr. Seasock evaluated C.P. for the return of firearms and evaluated her with the same format as a person seeking employment as a state trooper. *Id.* Dr. Seasock indicated that under the Traumatic Symptom Checklist, C.P. did not have indications of post-traumatic stress disorder and that she would be able to perform under high pressure situations in the absence of substance abuse. *Id.* at 17-18. Dr. Seasock noted that C.P. had difficulty with substance abuse and opined that she had not used any illegal substances since December 2016. *Id.* at 13; *see also id.* at 14 (noting she had to submit to regular drug and alcohol testing after her 2016 arrest and her employer required urine testing). Dr. Seasock additionally stated that "drugs and alcohol were the reason for the 302 going forward. Since living a sober and clean lifestyle, all the behavior; cognition, emotional, they disappeared. They're all substance abuse related." N.T., 2/8/2023, at 22. Further, he stated that "[m]aintaining

abstinence from all mood-altering substances" was imperative for her to stay in control of the drug and alcohol issues. *Id.*

When asked if he reviewed the 302 petition, Dr. Seasock testified:

It was provided to me just before walking into the courtroom and it's consistent with what [C.P.] explained in the past. However, the 201 which is typical – typical. The 302 is exactly what she stated, so it[']s consistent. There is no inconsistency there. Typically[,] after a person is 302[']d, they're offered a 201 procedure which they basically say, yes, I need help psychiatrically. Gotta stay in the hospital. That piece was not provided. [C.P.] has stated that she did change the 302 to a 201 procedure which again is actually most common for me over the years.

*Id.* at 18. He continued in his testimony, "[s]he grew up hunting in the family. And that's actually one of the reasons she wants to restore the rights." *Id.* at 21; *but see* Dr. Seasock Report, at 1 (unnumbered) (indicating that C.P. wanted her gun rights restored because "it was suggested for her own safety that she may wish to pursue a concealed carry permit or firearm ownership due to local incidents of assault on women"). Dr. Seasock concluded, within "a reasonable degree of scientific certainty", that C.P.'s firearm rights should be restored, "[b]ased upon the psychological evaluation and the standardized tests that we utilized". N.T., 2/8/2023, at 14-15.

On June 29, 2023, the trial court issued an order denying her petition. C.P. timely appealed and filed a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). She presents the following issue for our review: "Whether the trial court abused its discretion by denying C.P.'s petition for restoration of her firearm rights pursuant to section 6105(f)(1)

- 6 -

when it repeatedly misapprehended the record and reached erroneous conclusions?" C.P.'s Brief at 4 (unnecessary capitalization omitted).

Pursuant to section 6105(f)(1), the trial court has broad discretion to "grant such relief as it deems appropriate if the court determines that the applicant may possess a firearm without risk to the applicant or any other person." 18 Pa.C.S. § 6105(f)(1). We therefore review a decision on a petition to restore firearm rights for an abuse of discretion. **E.G.G. v. Pa. State Police**, 219 A.3d 679, 683 (Pa. Super. 2019) "An abuse of discretion is not merely an error in judgment" but "occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record." **E.G.G.**, 219 A.3d at 683 (citation omitted). Further, "[i]t is well-settled that a finder of fact is free to believe all, part[,] or none of a witness' testimony." **In re E.H.**, 233 A.3d 820, 823 (Pa. Super. 2020) (citation and brackets omitted).

In rejecting C.P.'s petition, the trial court found, in pertinent part, as follows:

> In the case at bar, C.P. was hospitalized after a call from her sister to local law enforcement regarding her drug use, suicidal threats and possible overdose. Upon arrival at the hospital, it was determined that C.P. required emergency treatment pursuant to the statute….
>
> The 302 application submitted noted a clear and present danger to others and noted that she attempted suicide and there was a reasonable probability of suicide unless adequate treatment is afforded under the act….

During the hearing, C.P. did not testify in detail about the averments in the 302 petition. The details as to the commitment come mostly from the actual 302 paperwork. On direct exam, she did not discuss [her] suicide attempt. On cross-[examination] when asked about her suicidal [i]deations, she stated that "A lot of issues I had were a result of my drug use. I don't know if I would – I could say – like, yeah, I wanted to die but definitely the drug use contributed to a very bad mental state." Dr. Seasock's report does not mention the averments in the 302 Petition.

As a result of the examination, C.P. was involuntarily committed….

C.P. claims that once she was transported to the second hospital she spoke to a nurse who explained her gun rights and she then voluntarily agreed to participate in treatment. Noting the condition that C.P. was in at the time, with her own admission to drug use, her statements that her right to own a gun was prevalent in her thoughts is questionable.

The petition describes threats to kill herself and an actual attempt by taking a bottle of Xanax to kill herself and crashing her car. The petition notes she was found unconscious in her car by local police. It further notes she was treating for anxiety and depression.

Also of concern is that Dr. Seasock admitted that he never saw the 302 Petition until walking into the hearing. None of the averments were reviewed or discussed in his report. Although he spoke to the alcohol and drug issue, he did not relate or review the averments that C.P. attempted to kill herself, while suffering from depression, anxiety and illegal drug use and on the day of her commitment stated that "she did not want to be here on earth alive."

Further, C.P.'s testimony was that she wanted her gun rights restored so she could hunt. She described the hunting with her family as a child and wanting to hunt and go into the woods alone.

Conversely, Dr. Seasock's report indicated that she wanted her gun rights restore because "it was suggested for her own

- 8 -

safety that she may wish to pursue a concealed carry permit or firearm ownership due to local incidents of assault on women." …

The record is inconsistent on a key point — the reason C.P. wants her gun rights restored. Dr. Seasock's report list[s] a very specific reason for the gun restoration[,] including recent incidents of harm to women. It notes she was seeking a concealed weapons permit. C.P. did not attest to any of those reasons as wanting [sic] her gun privileges restored.

Dr. Seasock has been treating C.P. for many years. He was asked to conduct the evaluation for the restoration of her gun rights. He still meets with her[,] yet he lists very different reasons for the restoration of the gun rights. Specifically, his report never mentions hunting or her family hunting traditions. Despite their continuous contact, he never reviewed the 302 paperwork before conducting the evaluations or completing his report. The first time he saw it was at the hearing. And apparently[,] he did not review the evaluation with C.P. or the discrepancies would have been discussed. For these reason[s], the report of Dr. Seasock is flawed. …

C.P. has accomplished many milestones over the past years that are commendable. Of concern is that all of the testimony as to her capacity to possess a firearm without risk to herself or others is contingent upon her sobriety.

She testified she is sober. She continues to suffer from anxiety and depression. Dr. Seasock stated that his opinion is contingent upon C.P. maintaining abstinence from all mood-altering substances. However, C.P. currently takes prescription [anti-anxiety] medication and nerve pain medication. The record is silent as to the name of the prescription drug[;] however[,] its intended purpose is to alleviate her anxiety and depression.

She participated in therapy for anxiety and depression since 2002 to current date. She testified she has been on prescribed medications since that time. She has suffered addiction to Vicodin, Xanax and Marijuana and is currently suffering from an injury that requires nerve medication. The reasons why the petitioner is seeking her rights to own a gun and/or a concealed weapons permit are not credible based upon the testimony, records and evaluation. For the reasons set forth in this opinion and upon review of the testimony and credibility of the witnesses,

- 9 -

[C.P.] has not met her burden that she may possess a firearm without risk to herself or any other person.

Trial Court Opinion, 11/20/2023, at 9-13 (citations omitted).

According to C.P., "the [t]rial [c]ourt abused its discretion … because it relied upon a multitude of factual findings that are not supported by the record." C.P.'s Brief at 14; *see also id.* at 20-21. First, she contends the court "relied upon erroneous factual findings to conclude that Dr. Seasock's opinions were insufficient." C.P.'s Brief at 16. Specifically, she argues that the trial court inaccurately concluded that Dr. Seasock was unaware of C.P.'s 302 commitment even though Dr. Seasock's report, supplemented by his testimony, provided that he reviewed C.P.'s history, interview, and evaluation. *Id.* at 14-17.

Further, C.P. alleges that "the [t]rial [c]ourt erroneously found that C.P. did not testify in detail about the averments in the involuntary commitment petition" and asserts that "[t]his is an abuse of discretion since the [t]rial [c]ourt's findings are contrary to the record." *Id.* at 17. C.P. states that she did not dispute any of the details in the involuntary commitment application. *Id.* Additionally, she assails the trial court's failure to consider the fact that her involuntarily commitment did not involve the use of, or the threat to use, a firearm. *Id.* at 17-19. Finally, C.P. emphasizes her many positive life changes and examples of rehabilitation in support of her petition, including maintaining her sobriety and attending law school. *Id.* at 21-22. C.P.

contrasted her situation with that in *E.G.G.*, noting that the petitioner in that case had a history of violent behavior. *Id.* at 22-24.

Preliminarily, we examine this Court's decision in *E.G.G.* There, the petitioner was involuntarily committed in 2003 for suicidal ideations, and again in 2005 for hallucinations and agitated behavior, that stemmed from his prescription drug addiction. *E.G.G.*, 219 A.3d at 681-82. In May 2017, petitioner filed a petition for the restoration of his firearm rights. *Id.* at 681. Petitioner noted that he had no further issues since his last commitment and provided a psychologist's report to support his assertion that he was not a risk to others. *Id.* at 681-82. Petitioner admitted, however that he remained on psychiatric medication. *Id.* at 682. Petitioner also testified about two separate confrontations with store clerks, where the police were called. *Id.* Neither his initial commitment, nor either of these incidents following it, involved the use of firearms. *Id.* Despite the psychologist's report, the trial court retained lingering concerns as to the petitioner's mental health, finding uncertainty in the psychologist's conclusion that "reinstatement of his gun permit would not increase the risk" of harm to himself or others. *Id.*

This Court found that the trial court did not abuse its discretion in its denial of the petition because his commitments were precipitated by his misuse of pain medication and that he was continuing to address his mental health by taking several prescribed medications. *Id.* at 684. We further noted petitioner's interactions with individuals, which caused the police to intervene.

*Id.* The Court concluded by quoting a passage from a prior decision on the same subject:

> A present clean bill of mental health is no guarantee that a relapse is not possible. Given the extreme potential harm attendant to the possession of deadly weapons by a person with a mental illness, and the risk of relapse, we see an important government interest in controlling the availability of firearms for those who have ever been adjudicated mentally disabled or have ever been committed to a mental institution but are now deemed to be cured. Although appellant has been pronounced cured of his depression, we see a legitimate government interest in still limiting the availability of firearms to him.

*Id.* (quoting *In re Keyes*, 83 A.3d 1016, 1027 (Pa. Super. 2013) (brackets omitted)).

Upon a review of the record in the case at bar, we conclude that the trial court did not abuse its discretion in denying C.P.'s petition for reinstatement of her firearms rights. Indeed, like *E.G.G.*, C.P. remains on psychiatric medication after a previous suicide attempt, and her capacity to possess a firearm depends on her sobriety. This was the testimony of Dr. Seasock, and it left the trial court with similar lingering concerns for her mental health and the high risk posed by restoring her rights as were present in *E.G.G. See E.G.G.*, 219 A.3d at 684. While C.P. attempts to distinguish *E.G.G.* based on the petitioner's confrontations that caused the police to respond, the overarching concern of *E.G.G.* is applicable here—namely, that C.P. had a past substance use disorder, continued to suffer from anxiety and depression for which she was taking prescribed medications, and as a result, there continued to be a grave concern about making firearms available to her.

C.P. objects to various credibility determinations made by the trial court regarding the testimony she provided and that of Dr. Seasock; however, her arguments notwithstanding, these credibility determinations have record support. For example, although Dr. Seasock stated that C.P. informed him of the basis of her 302 commitment, he never reviewed the paperwork that accompanied her commitment until he walked into the hearing and his report failed to review or discuss the averments therein in his report. N.T., 2/8/2023, at 18; **see also** Dr. Seasock Report, at 1-2 (unnumbered). Additionally, as the trial court found, C.P. did not provide detailed testimony about the circumstances giving rise to her 302 commitment. N.T., 2/8/2023, at 24-26. Further, C.P. and Dr. Seasock did in fact provide different reasons for her desire to seek reinstatement of her firearms rights. **Compare id.** at 21, 32 (C.P testified that she sought reinstatement of her firearm rights to go hunting and because she is often alone in the woods), **with** Dr. Seasock Report, at 1 (unnumbered) (Dr. Seasock indicating that C.P. wanted to restore her firearm rights and seek a concealed carry permit for her safety because of reports of women being attacked).[5]

---

[5] C.P. additionally contends that we should find an abuse of discretion based upon the trial court's statement that the 302 petition identified police officers, rather than paramedics, as the first responders who found C.P. unconscious in the vehicle. C.P.'s Brief at 19. Such an immaterial misstatement does not establish an abuse of discretion. **See E.G.G.**, 219 A.3d at 683 (defining abuse of discretion). The critical fact was that she was found unconscious in her vehicle after ingesting a bottle of Xanax in an attempt to kill herself.

Because the trial court's credibility determinations are supported by the record, we cannot disturb those findings. **See E.H.**, 233 A.3d at 824 ("As long as sufficient evidence exists in the record to support the finding found by the trial court, … we are precluded from overturning that finding …, thereby paying the proper deference [] to the factfinder who heard the witnesses testify … observe[d] the[ir] demeanor … and assess[ed] their credibility.") (citation omitted). Further, the trial court, as the factfinder, was well within its authority to discount Dr. Seasock's testimony and report. **See J.C.B. v. Pennsylvania State Police**, 35 A.3d 792, 797 (Pa. Super. 2012) (finding "the trial court, as the fact finder, acted within its discretion in[,]" inter alia, "discounting the testimony of [a]ppellant's psychiatric expert"); **see also E.H.**, 233 A.3d at 823-24 (holding that the trial court acted within its discretion to disregard an expert opinion supporting restoration of the petitioner's firearms rights by looking at his statements at the hearing).

Finally, although we recognize that none of C.P.'s past mental health or substance abuse concerns involved her use of, or threat to use, a firearm, this fact does not require the restoration of her firearm rights. Section 6105(f)(1) includes risk-oriented language that contemplates future firearm misconduct; it does not require any findings related to past misconduct with firearms. **See** 18 Pa.C.S. § 6105(f)(1) (stating petitioners are required to establish that they "may possess a firearm without risk to [themselves] or any other person").

- 14 -

C.P. does not cite any case law to support her argument, and the plain language of the statute belies her contention.

Based upon the record before us, and the standard by which we review this matter, we find no abuse of discretion in the trial court's rejection of C.P.'s petition to restore her firearm rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 08/15/2024